232

Disciplinary Board Docket no. 95 D.B. 85.

Report of the Disciplinary Board of the Supreme Court of Pennsylvania:

KELLER, *Member,* August 26, 1987 — Pursuant to Pennsylvania Rules of Disciplinary Enforcement 208(d)(2)(iii), the Disciplinary Board of the Supreme Court of Pennsylvania herewith files its report with respect to the above-captioned petition for discipline.

## HISTORY OF PROCEEDINGS

This matter was heard before Hearing Committee [  ] on a petition for discipline filed by petitioner on December 18, 1985. The petition charged respondent with the following violations of the Code of Professional Responsibility:

(1) D.R. 1-102(A)(3) — illegal conduct involving moral turpitude;

(2) D.R. 1-102(A)(4) — conduct involving dishonesty, fraud, deceit and misrepresentation;

(3) D.R. 1-102(A)(6) — conduct that adversely reflects on fitness to practice law;

(4) D.R. 9-102(A) — improper maintenance of clients' funds;

(5) D.R. 9-102(B)(1) — lack of prompt notice to client concerning receipt of client funds;

(6) D.R. 9-102(B)(3) — improper maintenance of accounts of funds of client; and

(7) D.R. 9-102(B)(4) — prompt payment of clients' funds.

Respondent filed an answer to the petition on January 21, 1986 and the case was heard before Hearing Committee [ ] on May 19, 1986 and June 26, 1986.

## STIPULATION OF FACTS

The facts herein have been stipulated to by the parties and stand as follows:

(1) Petitioner, whose principal office is situated at Commerce Building, 300 N. Second Street, Harrisburg, Pennsylvania, is invested pursuant to rule 207 of the Pennsylvania Rules of Disciplinary Enforcement with the power and duty to investigate all matters involving alleged misconduct of any attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

(2) Respondent was admitted to practice law in the Commonwealth of Pennsylvania on or about April 20, 1977. His office is located at [ ].

(3) Respondent also operated a business known as [A], a [ ] corporation.

(4) Respondent was in the business of negotiating contracts on behalf of individuals or organizations which sought to present programs of entertainment with entertainers or their agents.

234

(5) In certain of his correspondence and communications with such individuals, organizations, and agents for performers, respondent identified himself as an attorney and utilized his law office letterhead stationery and facilities.

(6) In or about August 1983, respondent entered into an agreement with [B] to provide for a [B] fund-raising event scheduled for February 29, 1984 the services of [C], a comedienne, and [D], a musician.

(7) [B] agreed to pay respondent $10,000 for the services of [C] and [D].

(8) Under respondent's agreement with [E], which manages [C], respondent was to pay $2,250 to [C] from the [B] payment, as confirmed by correspondence of August 10, 1983 and November 25, 1983 and agreement of November 30, 1983.

(9) Respondent also reached an agreement with [F], which manages [D], to pay $4,500 for his services, sent to [F] under cover of a letter of January 23, 1984.

(10) From the $10,000 paid by [B], respondent was to receive $3,250 for his costs and fee and $6,750 was due to [C] and [D].

(11) A check dated November 15, 1983 in the amount of $3,125 issued by [B] was sent to respondent in November 1985.

(12) Under cover of the November 25, 1983 letter respondent sent to [E] an Artists Personal Service Agreement dated November 30, 1983 setting forth the terms of the agreement and a check for $3,125 drawn on the attorney account dated November 15, 1983.

(13) During the period from October 1983 to October 1984, respondent maintained the following bank accounts: [G] Bank of [ ] account no. [ ]; [H] account no. [ ]; [H] account no. [ ].

(14) None of these accounts is an escrow account as defined in D.R. 9-102(A).

(15) The $3,125 check from [B] was negotiated.

(16) In or about November 1983, respondent was retained by the [I] in [   ], to arrange the appearance of the [J], a musical group, at a concert scheduled for March 24, 1984.

(17) Respondent contacted [K], of [L], in [   ], to inquire as to the availability of the [J], which is managed by [L].

(18) [K] advised respondent of the availability of the [J] for this engagement.

(19) Respondent entered into an agreement with [I] providing for a fee and costs of $6,500 for the March 24, 1984 booking, confirmed by a letter dated December 2, 1983 to [M] of [I], sent under cover of a letter of same date.

(20) Respondent's fee for providing the services of the [J] was $2,500.

(21) By letter dated December 2, 1983 respondent forwarded to [K] an Artists Personal Service Agreement for the [I] engagement, providing for compensation in the amount of $4,000 to the [J].

(22) In the letter respondent advised [K] that "as well as being an attorney representing many entertainers and entertainment concerns," he also engaged in "booking, consulting, and promoting entertainers."

(23) A copy of the executed agreement was returned to [I] under cover of a handwritten notice from respondent.

(24) A check dated December 9, 1983, in the amount of $4,500, payable to [A], was issued by [I] in partial payment for the March 24, 1984 booking and forwarded to respondent.

(25) On or about December 12, 1983 respondent opened account no. [   ] at [H], captioned "[Re-

spondent], Attorney at Law" (hereinafter "the attorney account").

(26) Respondent endorsed the $4,500 check from [I] "[Respondent], Attorney-at-Law for [A]."

(27) On December 12, 1983 respondent deposited into the attorney account the check in the amount of $4,500 received from [I] for the [J] program.

(28) Respondent drew a check on the attorney account dated December 9, 1983 in the amount of $1,125, payable to [C], which was transmitted to [E].

(29) The aforesaid check cleared the account on January 5, 1984.

(30) [B] sent to respondent a check in the amount of $6,875 dated January 20, 1984 payable to "[Respondent], Atty.-at-Law."

(31) On January 23, 1984, respondent deposited the $6,875 check into the attorney account.

(32) The [B] agreement was confirmed by letter from respondent to [N], the organizer, dated January 23, 1984.

(33) Respondent issued a check in the amount of $2,250, dated January 23, 1984, on the attorney account to [F] toward [D's] fee.

(34) Respondent transmitted the check to [F] under cover of a letter dated January 23, 1984, which also contained an Artists Personal Service Agreement.

(35) The agreement, dated January 23, 1984, is executed by respondent's signature over the words "Purchaser — [Respondent], Esquire for [B]."

(36) Respondent issued a check on the attorney account dated February 27, 1984 to [F] in the amount of $2,250, representing the balance of the funds due to [D].

(37) Respondent transmitted the check to [F] under cover of a letter dated February 27, 1984.

(38) The check cleared the account on March 2, 1984.

(39) On or about February 29, 1984 respondent issued a check to [E] in the amount of $1,125 representing the balance of the funds due to [C].

(40) The [J] performed a concert on behalf of [I] on March 24, 1984, as agreed in the contract.

(41) On March 25, 1984 a check payable to respondent, dated March 23, 1984, in the amount of $2,000, representing the balance due on the [J] agreement, was transmitted to respondent by [I].

(42) On March 28, 1984, respondent endorsed and deposited the $2,000 check from [I] in the attorney account.

(43) Respondent has not paid to [L] or to the [J] any portion of the $4,000 due to them for the services performed.

(44) Respondent was contacted on several occasions by [L] and its counsel demanding the funds due.

(45) On September 5, 1984 a letter of inquiry was sent to respondent by petitioner concerning his alleged failure to remit funds due to the [J].

(46) In response thereto, by letter dated October 19, 1984, respondent, through counsel, stated: "[H]e has arranged a satisfactory schedule with repayment. . . . He has arranged to see that that money is paid."

(47) Thereafter, although an agreement was reached, respondent failed to carry out his obligations to make restitution to the [J] thereunder.

(48) Judgment has been entered against respondent in the suit brought by [L] and remains unsatisfied.

(49) Respondent stipulates to the authenticity of petitioner's exhibits 1 through 61, and waives objec-

tion to their introduction on grounds other than relevancy or accuracy of computations.

(50) [K] would testify to the facts set forth in paragraphs 51 through 69 hereinbelow and identify the specified exhibits if he appeared as a witness at the hearing of the petition for discipline in no. 95 D.B. 85:

(51) He is involved in theatrical management in [ ], in a company known as [L].

(52) Among the groups managed by him is the [J].

(53) In or about November 1983, respondent contacted [K] by telephone to inquire as to the availability of the [J] to appear at a [I] program in March 1984.

(54) As [K] had never met or heard of respondent he asked him to identify himself.

(55) Respondent stated to [K] that he was an attorney, that he had been in practice for a number of years and was extensively involved in the entertainment business.

(56) [K] ascertained the availability of the [J] for this engagement and so advised respondent during this conversation.

(57) Respondent asked [K] whether he insisted upon a deposit for the engagement.

(58) Because respondent represented himself to be an attorney and because he was acting as agent for a college [K] advised that he did not feel that under the circumstances it would be necessary to have a deposit.

(59) Respondent utilized his law office address and telephone number in the [ ] Building in his dealings with [K].

(60) Under cover of a letter dated December 2, 1983 respondent forwarded to [K] a document titled "Artists Personal Service Agreement" dated December 12, 1983.

(61) [K] returned an executed copy of the agreement to respondent.

(62) Pursuant to the agreement between [K] and respondent, respondent was to pay for the services of the [J] on the night of their engagement.

(63) Respondent did not pay the [J] on that night and did not forward to [K] the fee for their services at any time thereafter.

(64) Respondent did not advise [K] of his receipt of payment from [I] for the services of the [J].

(65) [K] never gave respondent permission to utilize the funds due to the [J] for any purpose other than immediate payment to [K].

(66) Personnel in [K's] office contacted respondent on several occasions to attempt to obtain the funds due.

(67) Respondent failed to deliver the funds upon demand.

(68) [K] and the [J] have never received from respondent the $4,500 due to them.

(69) [K] has retained Pennsylvania counsel to institute suit against respondent to obtain the funds.

## CONCISE STATEMENT OF THE CASE

Respondent does not dispute that the monies he received from both contracts were deposited into either attorney accounts or general business accounts and commingled with other funds of respondent's legal and entertainment booking practices. The hearing committee also found it undisputed that the funds due the [J] under the [I] contract were never paid and are still owing.

## CONCLUSIONS OF LAW

The application of the code's Disciplinary Rules in the instant matter must be strictly confined to the activities of respondent which impinged upon his

stature as a member of the bar. The record as established by the hearing committee and the parties' stipulations shows the respondent received funds from [B] and [I] as a booking agent, not an attorney, and it was in this capacity as a booking agent that respondent deposited the monies in a non-escrow attorney account thereby commingling the funds with other business or attorney funds. Moreover, we cannot conclude that the relationship between respondent and [L] consisted of a fiduciary obligation on behalf of respondent to [L], and therefore, governed by the provisions of the Disciplinary Rules.

Taking the foregoing into consideration, we fail to find any violation by respondent of:

(1) D.R. 9-102(a) — improper maintenance of client funds.

(2) D.R. 9-102(B)(1) — lack of prompt notice to client concerning receipt of clients funds.

(3) D.R. 9-102(B)(3) — improper maintenance of accounts of funds of clients.

(4) D.R. 9-102(B)(4) — prompt payment of clients' funds.

Simply put, respondent and [L's] relationship was not one between an attorney and his client and thus lacked the element of fiduciary responsibility required of an attorney to his client and necessary for the application of the preceding rules.

As to the other allegations that respondent violated D.R. 1-102(A)(3), (4) and (6),[1] the hearing committee applied an agency standard in finding the

---

1. "A lawyer shall not:. . .

"(3) engage in illegal conduct involving moral turpitude.

"(4) engage in conduct involving dishonesty, fraud, deceit or misrepresentation. . .

"(6) engage in any other conduct that adversely reflects on his fitness to practice law."

existence of a fiduciary duty which naturally arises between an agent and a performer (or the performer's representative). In affirming the committee's application of D.R. 1-102(A)(4) and (6),[2] we are mindful that there exists a fine line between a lawyer's actions and those of a private individual when the activity involved is unrelated to that lawyer's practice of law. We conclude that respondent demonstrated certain improprieties in his dealing with [B], [I] and [L]. Due to the very nature of respondent's entertainment business, it is difficult to overlook his status as an attorney when reviewing the circumstances of the aforementioned transactions.

## RECOMMENDATION

The Disciplinary Board has determined that respondent, [ ], be given a private reprimand. In reaching this decision, the board is cognizant that the hearing committee recommended a public censure accompanied by a one-year probationary period for respondent's violation of D.R. 1-102(A)(4) and (6). By imposing the lesser discipline of a private reprimand, the board again acknowledges the fine-line distinction between the actions of an attorney and those of a private citizen concerning the business conducted in the instant matter. The board believes that the experience respondent has attained from the proceedings herein coupled with the assessed discipline conveys a forceful message to him as to the proper, ethical conduct demanded of a member of the bar of this Commonwealth.

2. Although not specifically applicable to the attorney/client relationship, the committee properly rejected D.R. 1-102(A)(3) due to the fact that respondent's conduct herein was by no means an illegality involving moral turpitude.

242

Pursuant to rule 208(g)(2) of the Pennsylvania Rules of Disciplinary Enforcement, the respondent is directed to pay the costs incurred in the investigation and prosecution of this matter.

Mr. Schwartzman dissents and would dismiss the charges.

Mr. Mundy dissents and would recommend disbarment.

Messrs. McDonald, McGinley and Tumolo did not participate in the adjudication.

## DISSENTING OPINION

MUNDY, *Member,* August 26, 1987 — In my view, respondent is guilty of an egregious infraction of the Code of Professional Responsibility and is, therefore, deserving of a substantially greater measure of discipline than the private reprimand urged by my colleagues. I must, therefore, dissent.

This is not simply a case where an attorney did not pay a debt nor is it just a matter of failing to fulfill the fiduciary obligations of an agent. The undisputed facts in this case are that respondent accepted monies ($4,000) from one party ([I]) to be paid to another ([J]) for which service respondent was to be paid a fee ($2,500). Instead, respondent *converted* the entire $6,500 to his own use. The monies were used in part to pay off a pre-existing obligation which had arisen under similar circumstances wherein respondent had failed to meet obligations he had contractually undertaken on behalf of the [B].

The hearing committee, as well as the majority of the board, found that an attorney-client relationship did not exist with respect to these transactions, and thus, dismissed those allegations in the petition for discipline, which refer directly to the parameters of

proper conduct within the attorney-client context.[3] They did find, however, that respondent was guilty of conversion, a most serious infraction of the Code of Professional Responsibility.

After a careful examination of the authorities presented to it in briefs filed by both sides, the hearing committee, in its well reasoned report, found that respondent had violated D.R. 1-102(A)(4), which prohibits conduct involving dishonesty, fraud, deceit, or misrepresentation; and D.R. 1-102(A)(6), which prohibits an attorney from engaging in any other conduct that adversely reflects on his fitness to practice law. These findings were accepted by the majority of the board. I would add the finding that respondent is also in violation of D.R. 1-102(A)(3) which prohibits an attorney from engaging in illegal conduct and moral turpitude. The knowing, willful and purposeful taking of monies which belong to another constitutes a per se violation of these rules.

Both the hearing committee and the majority of the board concur in the findings of fact and conclusions of law regarding conversion. The issue in dispute is the appropriate measure of discipline to be recommended in this matter. The hearing committee recommended a public censure by the Supreme

---

3. Respondent admittedly commingled all the funds which he received and, thus, was accused in the petition for discipline of the following violations:

(1) D.R. 9-102(A) — improper maintenance of client funds.

(2) D.R. 9-102(B)(1) — lack of prompt notice to client concerning receipt of client's funds.

(3) D.R. 9-102(B)(3) — improper maintenance of accounts of funds of clients.

(4) D.R. 9- 102(B)(4) — prompt payment of client's funds.

The hearing committee and the board concur that since there was no attorney-client relationship, respondent cannot be found guilty of those offenses which relate to commingling.

Court to be followed by a one-year probation. The majority of the board has recommended that respondent be given a private reprimand. It is my view that neither recommendation is truly reflective of the magnitude of respondent's offense.

A review of the case law shows that the Supreme Court has found conversion to be a most egregious offense justifying the disbarment of the perpetrator. *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982); *Office of Disciplinary Counsel v. Kissel,* 497 Pa. 467, 442 A.2d 217 (1982); *Matter of Leopold,* 469 Pa. 384, 366 A.2d 227 (1976); *Matter of Greene,* 470 Pa. 164, 368 A.2d 245 (1977); *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981); *Office of Disciplinary Counsel v. Herrmann,* 475 Pa. 560, 381 A.2d 138 (1977). In each of those cases, however, the conversion was committed within the lawyer-client context. Both the hearing committee and the board determined that the absence of a lawyer-client relationship provides a sufficient basis for distinguishing the instant case from those cited.

In effect, it is contended that because respondent's status as a lawyer was incidental to, rather than essential to, the transaction which led to the conversion, a lesser penalty is appropriate. Since, arguably, the [J] placed their confidence in respondent in his capacity as a booking agent rather than because he was a lawyer, it is claimed that respondent's misconduct does not extend to the public's perception of and confidence in the legal profession.

On the other hand, it is clear from the record that respondent did indeed hold himself out as an attorney in this transaction.[4] In fact, he made his status

---

4. In the contract transmittal letter to the agent representing the [J], respondent stated that he was "an attorney representing many entertainers and entertainment concerns." Board finding of fact no. 22.

as an attorney known to the agent representing the [J] *before* the agent agreed to a contract which provided no security in the form of an escrow or deposit. Respondent's reference to his profession clouds the issue considerably. If this reference was intended to induce a higher degree of confidence that the terms of the contract would be fulfilled, it can hardly be claimed that respondent's misconduct did not harm the reputation of the bar generally.

Taken in its best light, I find little merit in this argument. Conversion cannot be excused, nor its effect lessened, simply because the respondent was not wearing his "lawyer's hat" when the conversion took place. The circumstances may be distinguishable, but the difference is negligible.

I join with the hearing committee in being "extremely troubled by the fact that full restitution has not been made." Hearing Committee Report at 18. Respondent's failure to attempt to restore the monies he converted is indicative of a lack of remorse and, in my opinion, belies the majority's assertion that "the experience respondent has attained from the proceedings herein, coupled with the assessed discipline, conveys a forceful message to him as to the proper, ethical conduct demanded of a member of the bar of this Commonwealth." Majority opinion at 241.

Except for the fact that respondent's actions were outside the course of a lawyer-client relationship, the instant facts are quite similar to those in *Matter of Leopold, supra.* In that case, respondent had been "advanced" the sum of $5,500 by a client to be held in escrow against a potential claim of another. In this case, respondent was entrusted with a sum of money to be paid to another. In *Leopold,* as here, respondent, after converting the monies for his own use, made no attempt at restitution. This circum-

stance was not overlooked by the Supreme Court in disbarring Leopold:

"[P]etitioner had no legal claim to the possession or use of the funds beyond the terms agreed to with his client. Here we find it appropriate to emphasize that this petitioner's failure to make any recognizable effort to restore the misappropriated funds to his former client smacks of an irremissible indifference to his legal obligations." *Leopold* at 398, 366 A.2d at 234.

In my view, respondent in this case is no less deserving of the same measure of discipline as rendered by the Supreme Court in *Leopold*. I recommend that respondent be disbarred from the practice of law.

### ORDER

And now, August 26, 1987, upon consideration of the report and recommendation of Hearing Committee [ ] dated January 9, 1987; it is ordered and decreed, that the said [respondent] of [ ], be subjected to private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania as provided in rule 204(a)(5) of the Pennsylvania Rules of Disciplinary Enforcement at the next session of this board. Costs are to be paid by the respondent.